**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BARBARA VON GUNTEN,
                    *Plaintiff-Appellant,*

v.

STATE OF MARYLAND, MARYLAND
DEPARTMENT OF THE ENVIRONMENT,
                    *Defendant-Appellee.*

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                    *Amicus Curiae.*

No. 00-1058

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey II, Senior District Judge.
(CA-98-3883-H)

Argued: January 22, 2001

Decided: March 20, 2001

Before WILLIAMS and MOTZ, Circuit Judges, and
Claude M. HILTON, Chief United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Williams and Chief Judge Hilton joined.

_____

## COUNSEL

**ARGUED:** Neil Lawrence Henrichsen, HENRICHSEN SIEGEL,
P.L.L.C., Washington, D.C., for Appellant. Barbara L. Sloan, Office

of the General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. Andrew Howard Baida, Assistant Attorney General, Baltimore, Maryland, for Appellee. **ON BRIEF:** Joanna R. Onorato, HENRICHSEN SIEGEL, P.L.L.C., Washington, D.C., for Appellant. C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Office of the General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. J. Joseph Curran, Jr., Attorney General of Maryland, Norma Jean Kraus Belt, Assistant Attorney General, Stephanie Cobb Williams, Assistant Attorney General, Baltimore, Maryland, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

The district court granted summary judgment to the employer in this Title VII retaliation action on the ground that the employee offered no evidence that her employer took adverse employment action against her in retaliation for protected activity. Because none of the employer's asserted retaliatory acts adversely affected the terms, conditions, or benefits of her employment, we agree that the employee suffered no adverse employment action. Accordingly, we affirm.

I.

In January 1996, Barbara von Gunten began work as an Environmental Health Aide III (aide) at the Maryland Department of the Environment (MDE). Typically, an aide spends the three winter months conducting shoreline sanitary surveys, in which the aide places tracer dye in the toilets and washing machines of coastal residents and then checks the surrounding areas for leaks in the septic system. During the remaining nine warm-weather months, an aide works on a two-person boat, collecting water samples from various locations on the Chesapeake Bay.

After von Gunten had been working as an MDE aide for approximately six weeks, William Beatty, head of the Shellfish Monitoring Section, reviewed von Gunten's job performance. Beatty favorably rated von Gunten, stating, among other things, that von Gunten had shown the "ability to work well with fellow employees" and demonstrated "motivation and cooperation with fellow employees." In June 1996, von Gunten began performing full-time boat work. MDE assigned her to work on a boat with Vernon Burch, who served as von Gunten's field supervisor. Burch was responsible for providing von Gunten with on-the-job training, including instruction on how to operate and maintain the boat. The boat was a small, open sailing vessel that required the two operating employees to work in close proximity to one another. Both von Gunten and Burch reported to Beatty.

Almost immediately after von Gunten began working with Burch problems arose. Burch assertedly urinated from the boat, made crude and sexually suggestive comments toward von Gunten, and stared at and touched various parts of her body against her will. On August 1, 1996, von Gunten contacted Beatty to complain that Burch had sexually harassed her. Beatty, in turn, contacted his supervisor, John Steinfort. A few days later, Burch, von Gunten, Beatty, and Steinfort met to discuss the problem; the supervisors explained that no employee could sexually harass another and distributed the MDE anti-harassment policy. Burch denied that he had done anything improper. According to von Gunten, Burch's conduct did not improve, but rather worsened and she continued to complain to her supervisors about him.

On December 10, 1996, Beatty observed von Gunten and Burch working together and assertedly saw von Gunten screaming and acting in an unprofessional manner. On the next day, December 11, 1996, Burch struck von Gunten across the buttocks with an oar. After that incident, von Gunten telephoned Steinfort at home and asked to be taken off Burch's boat. Von Gunten asserts that Steinfort was unsympathetic to her complaints and demanded that she return to the boat the next morning or be fired. Steinfort maintains that von Gunten's charges against Burch were "unsubstantiated" and "completely out of character with" Burch's twenty-year "work record," and that he determined that Burch had inadvertently touched von Gunten with the

end of an oar while testing water depth. Nevertheless, Steinfort agreed to remove von Gunten from Burch's boat.

The next day, von Gunten informed Steinfort that she was going to contact MDE's Fair Practices Office to discuss her sexual harassment concerns. Later in the day, Steinfort, himself, contacted MDE's Personnel Director and Steven Bieber, an MDE Fair Practices officer; he told both men that he did not believe that there was enough information to substantiate von Gunten's harassment claims. On December 13, 1996, von Gunten sent a letter to the Director of MDE's Fair Practices Office, explaining her situation and requesting his office's assistance. At the Director's request, Bieber undertook an investigation, after which he concluded that although there was some evidence to support von Gunten's harassment claims, the harassment was not so "severe as to create an abusive working environment."

Von Gunten asserts that, after her December 13 letter to MDE's Fair Practices Office, MDE took a number of actions that constituted impermissible retaliation under Title VII. These include withdrawal of the state car that had been issued to von Gunten since her employment began, forcing her to use her personal car for work travel and request reimbursement for her mileage expenses; downgrading her year-end evaluation; reassigning her to shoreline survey work; improperly handling various administrative matters; and subjecting her to retaliatory harassment creating a hostile work environment. On February 28, 1997, von Gunten filed charges with the Equal Employment Opportunity Commission (EEOC), alleging sex discrimination and unlawful retaliation.

In August 1997, MDE presented for von Gunten's consideration a description of a job assignment for a new aide position. The new position would have required her to spend less time on boat work and more time performing shoreline surveys than von Gunten's previous position. Further, the position required that von Gunten spend more time at the field office where she would most likely come in contact with Beatty and Steinfort. Von Gunten rejected the position as unsuitable.

In October 1997, von Gunten met with the officials of MDE's Fair Practices Office to discuss her sexual harassment and retaliation

claims. According to von Gunten, they expressed little concern for her situation. On November 12, 1997, von Gunten resigned.

Following receipt of a notice from the EEOC of her right to sue, on November 25, 1998, von Gunten filed this action, asserting sexual harassment, constructive discharge, and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) *et seq*. After extensive discovery, MDE moved for summary judgment. The district court granted the motion as to von Gunten's constructive discharge and retaliation claims, but denied the motion as to von Gunten's sexual harassment claim. That claim subsequently was tried before a jury, which returned a verdict against von Gunten. Von Gunten now appeals the order granting MDE summary judgment on her retaliation claim.

Section 704 of Title VII, 42 U.S.C. § 2000e-3 (1994), provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge . . . under this subchapter." In this circuit, to establish a prima facie § 2000e-3 retaliation case, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action. *See Beall v. Abbott Laboratories*, 130 F.3d 614, 619 (4th Cir. 1997).[1]

---

[1]Although von Gunten acknowledges that this test must be met to state a prima facie § 2000e-3 retaliation case, the EEOC contends that the second prong of the test set forth above is too restrictive. The EEOC maintains that, unlike 42 U.S.C. § 2000e-2 (1994), which prohibits discriminatory employment actions, § 2000e-3 prohibits, not just "adverse employment actions," but also "any retaliatory conduct by an employer that is reasonably likely to deter protected activity." EEOC Brief at 13 and 15 n.1. But this court long ago determined, in a case that we (and others) have cited repeatedly, that § 2000e-3 retaliation claims, like § 2000e-2 discrimination claims, require proof of an "adverse employment action." *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). We explained in *Ross* that "Congress has not expressed a stronger preference for preventing retaliation under § 2000e-3 than for preventing actual discrimination under § 2000e-2" and "[i]n the absence of strong contrary policy considerations, conformity between the provisions of Title VII is to be preferred." *Id.* at 366.

For summary judgment purposes, MDE concedes that von Gunten has satisfied the first and third prongs of her prima facie case. However, MDE argues, and the district court found, that von Gunten had failed to proffer evidence that MDE took adverse employment action against her. Accordingly, resolution of this appeal hinges on whether von Gunten offered evidence that she suffered an "adverse employment action." The parties disagree as to how the district court defined "adverse employment action," what the appropriate standard is, and whether MDE engaged in such conduct, properly defined.

## II.

Von Gunten (and the EEOC) contend that the district court too narrowly defined the adverse employment action necessary to prove a § 2000e-3 retaliation claim as an "ultimate employment decision" involving hiring, granting leave, discharging, promoting, or compensating. MDE argues that the district court did no such thing. Rather, according to MDE, the court included within the definition of adverse employment action any conduct by the employer that discriminatorily alters the terms, conditions, or benefits of employment.

Sometimes the practical differences between these two standards are difficult to discern. For example, although the majority of circuits have either implicitly or explicitly rejected the "ultimate employment decision" standard in § 2000e-3 cases, they have nonetheless recognized that "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) (collecting cases). Also indicative of the sometime slight real world difference between the two standards is the fact that while the Eighth Circuit has ostensibly adopted the "ultimate employment decision" standard, it has consistently applied a broader standard. *See e.g.*, *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997) (ultimate employment decision includes "tangible change in duties or working conditions that constituted a material employment disadvantage"); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (ultimate employment decision includes reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, "papering" of an

employee's file with negative reports and reprimands even though employee was "not discharged, demoted, or suspended").

However, if strictly applied, use of the "ultimate employment decision" standard can be outcome determinative, as is crystalized in *Mattern v. Eastman Kodak Co.*, 104 F.3d 702 (5th Cir. 1997). There, the Fifth Circuit expressly held insufficient the kind of discriminatory changes in the terms, conditions, and benefits of employment, which most other courts have recognized could constitute adverse employment action under § 2000e-3. In *Mattern*, the court reversed a jury verdict finding that an employer had discriminatorily retaliated against an employee who had charged sexual harassment. *Id.* at 703-04. The employee produced evidence that her employer had reviewed her work negatively causing her to lose a pay increase, required her to wear an unsafe fire protection suit, verbally threatened to fire her, improperly placed in jeopardy her continuance in an apprenticeship program, and committed numerous other acts of harassment causing her to suffer depression and panic attacks requiring a doctor's care and medication. *Id.* at 705-706; 713-14 (Dennis, J. dissenting). In reaching its conclusion that none of these acts, either individually or collectively, constituted adverse employment action, the Fifth Circuit relied on differences in the language of Title VII's general anti-discrimination provision, 42 U.S.C. § 2000e-2 (1994), and its anti-retaliation provision, 42 U.S.C. § 2000e-3. *Id.* at 708-09. The court noted that § 2000e-2(a)(2) made it unlawful for an employer to "limit, segregate, or classify his employees . . . *in any way* which would deprive *or tend to deprive* any individual of employment opportunities or *otherwise adversely affect* his status as an employee," (emphasis added), and contrasted this language with that in the anti-retaliation provision, § 2000e-3, which simply forbids "discrimination" against "any" employee. *Id.* at 709. The *Mattern* court concluded:

> The anti-retaliation provision speaks only of "discrimination"; there is no mention of the vague harms contemplated in § 2000e-2(a)(2). Therefore, th[e anti-retaliation] provision can only be read to exclude such vague harms, and to include only *ultimate employment decisions.*

*Id.* (emphasis added).

If this circuit employed a similar "ultimate employment decision" standard in retaliation cases, then indisputably von Gunten would be unable to mount a prima facie case. This is so because none of MDE's retaliatory acts constituted an ultimate employment decision — none involved hiring, firing, refusal to promote, or the like.

But "ultimate employment decision" is not the standard in this circuit. As noted above, *see* note 1, we have expressly rejected distinctions, like those drawn by the *Mattern* court, between § 2000e-2 and § 2000e-3, reasoning that "conformity between the provisions of Title VII is to be preferred." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 366 (4th Cir. 1985). Moreover, in *Ross*, we also implicitly rejected the *Mattern* court's view that nothing less than an "ultimate employment decision" can constitute adverse employment action under § 2000e-3.

In *Ross*, the plaintiff charged that his employer retaliated against him for engaging in protected activity by engaging in retaliatory harassment including reducing his job "responsibilities and professional status," denying him "a performance review and annual salary and benefit increases," and providing "false information" to prospective employers. *Id.* at 357. After concluding that the district court improperly relied on the preclusive effect of a state administrative determination to grant summary judgment to the employer, we reversed and remanded Ross's retaliatory harassment claim for "reconsideration of the propriety of summary judgment" and "for trial" if necessary. *Id.* at 363. In doing so, we recognized that these alleged acts of retaliatory harassment, if proved, could constitute adverse employment action; otherwise remand would have been unnecessary. *See also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (recognizing retaliatory harassment claim).

In our most recent discussion of "adverse employment action" under § 2000e-3, *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 242 (4th Cir. 1997), we quoted and followed *Ross*. Although we held that the challenged retaliatory acts of the employer did not constitute adverse employment action, this was not because those acts failed to rise to the level "ultimate employment decisions," but because Munday offered no evidence that those acts "adversely affected" the "terms, conditions, or benefits" of her employment. *Id.*

at 243. Munday alleged that after she had settled her sexual harassment and discrimination claims, her supervisors yelled at her upon hearing a rumor that she had planned to sue the company again, instructed other employees "not to socialize" with her, to "avoid her as much as possible," and to "report back" anything she said. *Id.* at 241.[2] We refused to hold that such conduct constituted adverse employment action, reasoning: "In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in protected activity, without evidence that *the terms, conditions, or benefits of her employment were adversely affected*." *Id.* at 243 (emphasis added).

Although we have never before expressly so held, *see Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 n.11 (4th Cir. 2000), *Ross* and *Munday* teach that conduct short of "ultimate employment decisions" can constitute adverse employment action for purposes of § 2000e-3. Of course, "ultimate employment decisions" — to hire, discharge, refuse to promote, etc. — can constitute the necessary adverse employment action, but "retaliatory harassment" can also comprise adverse employment action. *See Ross*, 759 F.2d at 363. What is necessary in all § 2000e-3 retaliation cases is evidence that the challenged discriminatory acts or harassment adversely effected "the terms, conditions, or benefits" of the plaintiff's employment. *Munday*, 126 F.3d at 243.

We think it highly unlikely that the experienced district judge in the case at hand would have failed to recognize the teaching of *Ross* and *Munday*. In fact, the district judge expressly cited and quoted *Munday*, apparently recognizing that "evidence that the terms, conditions, or benefits of employment were adversely effected" is the sine qua non of an "adverse employment action." *Von Gunten v. Maryland Dep't of Env't*, 68 F. Supp. 2d 654, 662 (D. Md. 1999) (quoting *Munday*, 126 F.3d at 243). The confusion as to what standard the district court followed has emerged because the court also quoted *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981), and noted that when "de-

---

[2]Munday was also "subjected to a number of work related unpleasantries." However, she complained of them and her employer "adequately investigated and addressed" them. *Munday*, 126 F.3d at 242.

termining whether there ha[d] been discrimination with respect to 'personnel actions' taken by the defendant," we there focused on "whether there ha[d] been discrimination 'in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensating.'" *Von Gunten*, 68 F. Supp. 2d at 662. This accurate quotation of *Page* is nothing more than recognition that adverse employment action includes "ultimate employment decisions." Given the remainder of the district court's excellent analysis and its express determination that "[t]he essential terms, conditions and benefits" of von Gunten's employment "were not adversely affected by actions" taken by MDE, *id.* at 663, we cannot interpret the quotation from *Page* as improperly restricting § 2000e-3 adverse employment action to "ultimate employment decisions."[3]

---

[3]Contrary to the suggestion of the *Mattern* court, 104 F.3d at 707, *Page*, itself, provides no basis for such a restriction. In *Page*, a federal postal employee, who had been denied promotions, sued the Postmaster General, claiming racial discrimination because the committee designated to review his qualifications for promotion contained no African-Americans. *Page*, 645 F.2d at 229. Significantly, in *Page*, the employee sued not under § 2000e-3, which proscribes retaliation in the private sector, but under § 2000e-16, an anti-discrimination provision that applies only to federal-sector employees. *See id.* at 228. Section 2000e-16 provides in relevant part that "[a]ll *personnel actions*" shall be free from any discrimination. 42 U.S.C. § 2000e-16 (1994). We reasoned in *Page* that inclusion of the term "personnel action" in § 2000e-16 indicated that "ultimate employment decisions" arose to "the general level of decision" targeted by Congress in that statute. *Id.* at 233. *See also Boone v. Goldin*, 178 F.3d 253, 255-56 (4th Cir. 1999) (citing *Page* in another federal sector case). Of course, § 2000e-3 does not confine its reach to "personnel actions" and thus this reasoning simply does not apply to retaliation actions, like the one at hand. Moreover, our fundamental concern in *Page* was that the pretext inquiry must focus on the employment decision itself, not the racial composition of a selection committee; if discrimination drove the employment decision, a Title VII action might lie, but discrimination that only effected the makeup of a selection committee could not be the basis for a Title VII action. *Page*, 645 F.2d at 233. Finally, even in the public sector context, *Page* did not hold, as *Mattern* does, that "hiring, granting leave, discharging, promoting, and compensating" was an exhaustive list of what constituted an "ultimate employment decision." *Mattern*, 104 F.3d at 707-08. Rather, we expressly explained that there are other actions that meet this definition. *See Page*, 645 F.2d at 233.

In sum, we continue to believe that the standard articulated in *Ross* and *Munday* most accurately reflects what Congress intended as requisite for a § 2000e-3 retaliation action. Adverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the "terms, conditions, or benefits" of employment. *Munday*, 126 F.3d at 243. Moreover, we believe that the district court recognized that this was the governing standard. Accordingly, we turn to the final question — did the district court properly apply this standard.[4]

### III.

Von Gunten contends that the following conduct by MDE constituted adverse employment action: (1) withdrawing the use of a state vehicle; (2) "downgrading" her year-end performance review; (3) reassignment to shoreline survey work; (4) improper treatment of various administrative matters; and (5) retaliatory harassment creating a hostile work environment. We consider each of these in turn.

### A.

Von Gunten initially asserts that MDE's decision to deny her use of a state vehicle constitutes an adverse employment action. On December 19, 1996, six days after von Gunten brought her discrimination claims to MDE's Office of Fair Practices, Steinfort informed her that she could no longer use the state vehicle assigned to her during the preceding eleven months because it had to be reallocated to MDE employees who had greater need for a state vehicle. For the next six months, von Gunten had to use her own vehicle in her work (and obtain reimbursement for mileage). In early June 1997, MDE provided her with another state vehicle.

---

[4]We note that the First, Ninth, Tenth, and Eleventh Circuits have similarly held that Title VII's protection against retaliatory discrimination extends to adverse acts that fall short of ultimate employment decisions. *See Fielder v. UAL Corp.*, 218 F.3d 973, 984 (9th Cir. 2000); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455-56 (11th Cir. 1998); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996); *Wyatt v. City of Boston*, 35 F.3d 13, 15-16 (1st Cir. 1994).

Temporary withdrawal of use of a state vehicle in these circumstances does not constitute an adverse employment action. First, it is not at all clear that use of a state vehicle constituted a benefit of von Gunten's employment. *Cf. Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) (opportunity to become partner in a law firm was an employment benefit protected by Title VII because it was "part and parcel of the employment relationship"). Von Gunten herself concedes that "MDE was not obligated to provide [her] a [state] vehicle." Brief of Appellant at 39. Moreover, considerable uncontested evidence establishes that von Gunten could not have reasonably expected that she would enjoy permanent use of a state vehicle. For example, Steinfort testified, without contradiction, that the withdrawal of von Gunten's state vehicle comported with MDE's "fleet policy" allocating vehicles "to the highest users for financial reasons" and that "other members of the unit were working intercounties [sic] and traveling as much as 100 miles before reaching their survey areas," unlike von Gunten, who lived very close to hers. Furthermore, even if use of the state vehicle was a protected employment benefit, von Gunten has utterly failed to proffer evidence that elimination of this benefit adversely affected her. To the contrary, MDE fully compensated von Gunten for the mileage she put on her personal vehicle during the period in which a state vehicle was unavailable, and assigned another state vehicle to her in early June 1997, along with a state gas card.

B.

Von Gunten next maintains that MDE's "downgrading" of her year-end review constituted an adverse employment action. Undoubtedly, a retaliatory downgrade of a performance evaluation *could* effect a term, condition, or benefit of employment. *See, e.g., Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) ("unfavorable evaluation" constitutes an adverse employment action when used "as a basis to detrimentally alter the terms or conditions of the recipient's employment"). But the facts of this case, even viewed in the best light for von Gunten, unequivocally establish that the challenged action did not do that here.[5]

---

[5]Von Gunten also contends that MDE's postponement of the year-end review from January 1997 to February 1997 and changes to her initial

At the time of von Gunten's year-end review, MDE was in the process of changing from one kind of evaluation form to another and so evaluated von Gunten on both forms. On the old form, in which a supervisor could rate an employee as "deficient," "needs improvement," "competent," "highly competent," or "excellent," von Gunten's supervisor rated her as "need[ing] improvement." On the new form, with only three available ratings — "unsatisfactory," "satisfactory," or "superior" — he rated her "unsatisfactory" in three categories, and "satisfactory" in two, with an overall "unsatisfactory" rating. However, because the supervisor believed that his overall rating was not entirely representative of von Gunten's performance in 1996, he also recommended that she be granted a salary increase, and she in fact received that salary increase.

As we understand von Gunten's contention, she does not challenge her "needs improvement" year-end rating on the old form. *Cf. Spears*, 210 F.3d at 854 ("A poor performance does not in itself constitute an adverse employment action because it has no tangible effect on the recipient's employment"). Rather, her argument focuses solely on the differences between the old form's "needs improvement" rating and the new form's "overall unsatisfactory" rating. She contends the latter is a "downgrade" of the former. We have difficulty in discerning any significant difference between the two. Even accepting the notion that a rating of "needs improvement" may differ slightly from that of "overall unsatisfactory," this distinction had no practical consequences for von Gunten because MDE still granted her a pay raise. Thus, the terms, conditions, and benefits of von Gunten's employment were in no way jeopardized.

---

six-week job evaluation constitute adverse employment actions. No record evidence indicates that the one-month postponement adversely effected von Gunten in any way. As for the initial six-week evaluation, Beatty, von Gunten's supervisor, changed her initial evaluation because he had filled it out incorrectly — assessing her first six weeks of work rather than stating aspirational goals in light of that work. Although his original comments were positive, the changes were minor and in any event only concerned her first six weeks at MDE; these changes had no effect on anything.

C.

Von Gunten also argues that her reassignment to shoreline survey work, after she asked to be separated from Burch, constitutes an adverse employment action because although she did not suffer a decrease in pay, benefits, or job title, the "nature of [her] work at MDE did change significantly." Brief of Appellant at 44. Specifically, von Gunten asserts that the change in job assignment was "significantly detrimental and not trivial," that it prevented her from pursuing a boat captain's license, "exposed her to dangerous pathogens," and subjected her to less appealing working conditions, namely, "more burdensome paperwork and daily interaction with the public." *Id.* at 45.

If the change in von Gunten's job assignment truly had been significant, if, for example, it exposed her to more dangerous conditions or stifled advancement by preventing her from obtaining a professional license, then her contention would have merit. *See Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 994 (C.D. Cal. 2000) (adverse employment action where employer failed to forward plaintiff's medical board documents that were crucial to board's granting of plaintiff's medical license). But even von Gunten concedes that a captain's license was not a requirement of the job, nor could it enhance her job status; she admits that she simply wished to pursue a captain's license as a personal goal. Additionally, while we agree in principle that increased exposure to dangerous pathogens could adversely effect the terms, condition, or benefits of employment, von Gunten has failed to proffer any credible evidence that her exposure to these chemicals did in fact increase in the new assignment.

As for the other changes that made the new assignment less appealing to von Gunten — more shoreline duty, less boat work, and more interaction with the public — we cannot hold that these constituted an adverse employment action. Removing von Gunten from all boat work was only temporary while MDE sought new boat work opportunities for her. Moreover, this change in working conditions largely resulted from von Gunten's own request to be removed from Burch's boat. MDE appears to have accommodated that request as best as it could in light of the fact that there were no other positions available on other boats. Nothing in the record indicates that MDE did not put

forth a good faith effort to find von Gunten the boat work that she desired. We do not suggest that an employee, who believes that she is the victim of unlawful discrimination or retaliation, must agree to a reassignment to avoid jeopardizing her Title VII claim. But if, as here, an employee, who believes she has been sexually harassed, requests reassignment and her employer reassigns her to the *only* available job, then a court must view with some skepticism that employee's claim that the reassignment constituted an adverse employment action.

D.

Additionally, von Gunten argues that MDE mishandled various administrative issues, creating "a continual campaign of retaliation" against her, which constitutes adverse employment action. Brief of Appellant at 46.

For instance, von Gunten contends that on January 9, 1997, Beatty and Steinfort began "hyper-scrutinizing" her sick leave, informing her that she needed to provide documentation for all prior and future sick leave, after she had taken days off on Christmas Eve and New Year's Eve for doctor's appointments. She also maintains that on that same day MDE improperly responded to a citizen's complaint lodged against her by writing her up and placing her on administrative leave with pay for a short time to allow investigation of the matter. But terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from a state agency's disciplinary procedures. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996) (no adverse employment action where employer enforces a generally applicable policy against employee). Moreover, we fail to see how MDE's demands that von Gunten comply with sick leave policy adversely affected her employment. Nor do we attribute any adverse effects in relation to the citizen's complaint to MDE — if anything, they were the result of von Gunten's own conduct.

Von Gunten also maintains that the *manner in which* MDE implemented its sick leave and disciplinary policies against her constitutes an adverse employment action. She asserts that Beatty did not ask any other employees to provide written documentation for their absences,

or treat any other employee charged with a citizen complaint as severely as von Gunten. This might be evidence of pretext, *see Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 200 (3d Cir. 1996) (relied on by von Gunten), but it is not evidence of adverse employment action.

Von Gunten additionally offers a laundry list of job occurrences during 1997 that annoyed her and assertedly constitute adverse employment actions. For example, von Gunten claims that: (1) throughout the year she continued to be hyper-criticized for her requests for leave and her expense forms; (2) Beatty often turned down her requests to attend seminars, saying he needed her in the field, while in 1996 he had usually approved such requests; (3) when she visited the field office, an employee followed her around and questioned her activities; and (4) the MDE Fair Practices Office did not adequately deal with her complaints. We have carefully reviewed the record and, although these occurrences may have irritated von Gunten, no evidence indicates that they actually adversely effected a term, condition, or benefit of her employment. Thus, they do not constitute adverse employment action.

E.

Finally, von Gunten asserts that MDE subjected her to retaliatory harassment creating a hostile work environment. Retaliatory harassment can constitute adverse employment action, *see Ross*, 759 F.2d at 363-64, but only if such harassment adversely affects the "terms, conditions, or benefits of her employment." *Munday*, 126 F.3d at 243.

Von Gunten's retaliatory harassment claim fails. For a hostile work environment claim to lie there must be evidence of conduct "severe or pervasive enough" to create "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1983). The plaintiff's burden of proof in this regard is twofold: she must show that her workplace was both subjectively and objectively hostile. *Id.* The sole basis for von Gunten's claim is the actions outlined above, "[i]n their totality." Brief of Appellant at 54. We have no doubt that these acts upset von Gunten to a degree that she subjectively perceived her work environment at MDE to be abusive. However, there is no evidence that they created "an environment that a reasonable person would find hostile or abusive." *Id.* Rather,

the acts von Gunten alleges occurred episodically over a year and a half and were not so severe that a reasonable person would find them abusive. They merely involved the imposition of generally applicable departmental policies, good faith responses to von Gunten's request to be moved away from Burch, administrative difficulties in implementing a new performance evaluation system, and non-actionable office unpleasantries that were at most the result of "predictable tension" in the workplace following the lodging of discrimination and retaliation charges. *See, e.g.*, *Raley v. Bd. of St. Mary's County Comm'rs*, 752 F. Supp. 1272, 1281 (D. Md. 1990).

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*